# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| TIMOTHY RICHARD WARREN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14-CV-2373 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | ) | |
| TENNESSEE; CORPORAL JEREMI | ) | |
| SNIPES; SERGEANT SEAN LLOYD; | ) | |
| CORPORAL JOHN HAYES; AND | ) | |
| OFFICER ALONA WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending in this case are four motions to dismiss.  Defendant Metropolitan Government of Nashville ("Metro") has filed a Motion to Dismiss ("Metro's First Motion to Dismiss") (Docket No. 20).  Defendant Sergeant Sean Lloyd ("Lloyd") has filed a partial Motion to Dismiss (Docket No. 24).  Defendant Corporal John Hayes has filed a Motion to Dismiss (Docket No. 35).  Plaintiff Timothy Richard Warren ("Warren") has filed a joint response to these three motions, (Docket No. 37), to which Metro (Docket No. 40) and Lloyd (Docket No. 44) have filed Replies.  Metro has also filed a Motion to Dismiss the Official Capacity Claims Against the Individual Defendants ("Metro's Second Motion to Dismiss") (Docket No. 41), to which Warren has not responded.  For the following reasons, Metro's First Motion to Dismiss, Lloyd's partial Motion to Dismiss, and Hayes's Motion to Dismiss will each be granted in part and denied in part, and Metro's Second Motion to Dismiss will be granted.

1

## FACTS AND PROCEDURAL BACKGROUND

This case, brought under 42 U.S.C. § 1983 and the laws of the state of Tennessee, involves the alleged use of excessive force against Warren while he was in the custody of the defendants.[1] Warren is a resident of Davidson County, Tennessee. Metro is a political subdivision of the State of Tennessee. At all times relevant to this action, Defendants Corporal Jeremi Snipes, Officer Alona Williams, Lloyd, and Hayes (together, the "Individual Defendants") were employees of the Davidson County Sheriff's Office, a subdivision of Metro, acting within the scope of their employment as law enforcement officers at the Criminal Justice Center ("CJC").

Warren was arrested for public intoxication some time on the final night of 2013, and he was brought to the CJC as a pre-trial detainee. At approximately 1:25 a.m. on January 1, 2014, Warren was involved in the booking process. During the course of this process, Snipes punched Warren in the face, injuring him. According to the Complaint, there was no purpose for this attack. After Warren was punched in the face, he was subjected to further force and restraint by Snipes, Lloyd, Hayes, and Williams. Williams placed her hand and knee on the side of Warren's head and administered a chemical spray to his face. Lloyd pushed down on the legs of Warren and applied restraints. Hayes grabbed the upper body of Warren and held him down, ostensibly to prevent him from getting back up to his feet. Snipes participated in the restraint of Warren on the ground.[2] The Complaint alleges that these actions were not made in a good faith effort to

---

[1] Facts are taken from the Complaint (Docket No. 1) and are taken as true for purposes of evaluating the motions to dismiss.

[2] These events were recorded by video camera. According to Warren's brief, Metro declined to allow him to view the videotape.

maintain or restore discipline in circumstances under haste, under pressure, or without the luxury of a second chance; rather, they were intentional and lacked legitimate penologic purpose.

Warren was thereafter escorted to a "seclusion cell." Warren remained alone in the seclusion cell for over an hour. During this time, Warren suffered immense pain from head and leg injuries without medical treatment. At approximately 3:12 a.m., CJC staff determined that Warren had injuries requiring medical attention at a hospital and caused him to be transported for treatment. It was determined that Warren had sustained multiple injuries, including a broken fibula, a right ankle fracture, ankle dislocation, and facial lacerations. Warren ultimately required and underwent surgery on his fractured ankle.

Later that morning, Snipes and Hayes filed Disciplinary Incident Reports stating that Warren sustained his ankle injury before he was punched in the face by Snipes. On January 2, 2014, Sergeant Scott Satterlee filed a Use of Force Report ("UFR") regarding the incident. The UFR noted that Warren "possible [sic] injured his ankel [sic] as he walked into intake." (Docket No. 1 at ¶ 26.) Lieutenant William Gise commented on the report: "The amount of force used does appear to be inappropriate; however it was the officer [sic] immediate reaction to the incident. The inmate?s [sic] ankle appears to be broken during the [use of force] when the inmate rolls his ankle and falls. [Use of force] complies with DCSO policies; however the inmate should have been placed in cuffs when he started treating [sic] staff. This has been addressed with staff." (*Id.*)

On January 3, 2014, Warren filed an inmate grievance form to report the incident. On January 7, 2014, an investigating officer who reviewed the grievance – the same Lieutenant Gise – concluded that the Individual Defendants' actions "were within policy" and found the

complaint "unsubstantiated." (*Id*. at ¶ 28.)

On October 23, 2014, Satterlee's UFR was amended with the following "administrative disposition" by Chief of Security Jamie Johnson: "This [use of force] does not appear to be in compliance with [Davidson County Sheriff's Office] policy or procedure. This needs to be reviewed by HR." (*Id*. at ¶ 29.) Ultimately, after further review of the entire incident, Snipes was suspended from work for use of excessive force against Warren.

Warren filed a Complaint in this court on December 19, 2014. (Docket No. 1.) On February 24, 2015, Metro filed its First Motion to Dismiss. (Docket No. 20.) On February 26, 2015, Lloyd filed his partial Motion to Dismiss. (Docket No. 24.) On March 26, 2015, Hayes filed his Motion to Dismiss. (Docket No. 35.) On April 9, 2015, Warren filed a joint Response to Metro's First Motion to Dismiss, Lloyd's partial Motion to Dismiss, and Hayes's Motion to Dismiss. (Docket No. 37.) On April 17, 2015, Metro filed a Reply (Docket No. 40), and on April 20, 2015, Lloyd filed a Reply (Docket No. 44). Also on April 17, 2015, Metro filed its Second Motion to Dismiss (Docket No. 41), to which there has been no response filed by Warren.[3]

Warren's Complaint brings federal and state law claims. First, Warren claims that all of the defendants violated his civil rights under 42 U.S.C. § 1983 by subjecting him to excessive force under the Fourteenth Amendment's Due Process Clause, which protects a pretrial detainee from the use of excessive force that amounts to punishment that does not serve a legitimate

---

[3] On February 26, 2015, Snipes filed an Answer to the Complaint. (Docket No. 22.) On the same date, Lloyd filed a partial Answer to the Complaint (as to Warren's TGTLA negligence claim only). (Docket No. 26.) On March 26, 2015, Williams filed an Answer to the Complaint. (Docket No. 34.)

governmental purpose. Second, Warren claims that the defendant Metro has violated his civil rights under 42 U.S.C. § 1983 by implementing policies, procedures, practices, or customs that amount to deliberate indifference to the right of Warren to be free of excessive force under the Fourteenth Amendment to the Constitution of the United States. Specifically, Warren claims that Metro had customs and policies of failing to adequately train and supervise its agents that violated clearly established law and put Metro on notice of potential liability. Finally, Warren brings a state law claim for negligence against all defendants pursuant to the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

While the Complaint does not explicitly set forth a claim for conspiracy under the federal civil rights laws, Warren alleges (in the "parties" section of the Complaint) that each defendant acted individually and in conspiracy with one another.

## RULE 12(b)(6) STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

A complaint's allegations, however, "must be enough to raise a right to relief above the

speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

## ANALYSIS

I. **Defendant Metro**

A. **Conspiracy**

Metro contends that there can be no viable claim of conspiracy against it because, as a government entity, it cannot, as a matter of law, conspire with its correctional officer employees. It has long been the general rule in the Sixth Circuit in civil conspiracy cases that a corporation cannot conspire with its own agents or employees. *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). Although this doctrine was first developed in the context of antitrust litigation, the Sixth Circuit in *Doherty* stated that "the same rule has been consistently applied in allegations of conspiracy under the Civil Rights Act." *Id.* In so doing, the Sixth Circuit agreed with a Second Circuit decision, *Herrmann v. Moore*, 576 F.2d 453 (2nd Cir. 1978), which first applied the "intra-corporate conspiracy" doctrine to bar a plaintiff's Section 1985(2) civil rights claim. Following *Doherty* and *Herrmann*, the Sixth Circuit expressly applied the doctrine to Section 1985 conspiracy claims, which involve conspiracies by individuals (including private citizens) to deprive individuals of their civil rights. *See Hull v. Cuyahoga Valley Joint*

*Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991). The court in *Hull* relied upon the core rationale that "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hull*, 926 F.2d at 510 (citing *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)). Since *Hull*, multiple courts within this circuit have applied the intra-corporate conspiracy doctrine to not just Section 1985 conspiracy claims, but also to cases involving allegations of conspiracy brought under the wider rubric of Section 1983. *See, e.g.*, *Upton v. City of Royal Oak*, 492 F. App'x 492, 493, 503 (6th Cir. 2012) (citing *Hull*); *Wright v. Bloomfield Twp.*, 2014 WL 5499278, at *15 (E.D. Mich. Oct. 30, 2014); *Pardi v. Cnty. of Wayne*, 2013 WL 1011280, at *14-15 (E.D. Mich. Mar. 14, 2013); *Mauldin v. Napolitano*, 2012 WL 2870834, at *5 (E.D. Mich. July 12, 2012).

Warren alleges that the Individual Defendants were acting within the scope of their employment as agents of Metro, their governmental employer. Pursuant to the intra-corporate doctrine, it is not possible for Metro to have conspired with itself. The court notes that Warren, citing to one district court case, argues that naming Metro in a conspiracy claim is a harmless redundancy for pleading purposes. *See* Response at 2 (citing *Brown v. City of Memphis*, 440 F.Supp. 2d 868, 873 (W.D. Tenn. 2006)). However, *Brown* does not involve conspiracy allegations against a municipal defendant. Allowing Metro to remain as a defendant against a claim of conspiracy suggests that Metro could face liability for conspiring with its own officers. This is not so. Accordingly, any conspiracy claim against Metro will be dismissed.

**B.      Section 1983 Municipal Liability Claim**

Metro next contends that the Complaint contains insufficient allegations to maintain

claims for use of excessive force and failure to train.  Metro cannot be held liable under Section

1983 on a *respondeat superior* basis.  *See Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33

(6th Cir. 2005) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).  Under

Section 1983, a municipality can only be held liable if the plaintiff demonstrates that the alleged

federal violation was a direct result of the city's official policy or custom.  *Burgess v. Fisher*, 735

F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 693); *Regets v. City of Plymouth*, 568

F. App'x 380, 394 (6th Cir. 2014) (quoting *Slusher v. Carson*, 540 F.3d 449, 456–57 (6th Cir.

2008)).  A plaintiff can make a showing of an illegal policy or custom by demonstrating one of

the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an

official with final decision making authority ratified illegal actions; (3) the existence of a policy

of inadequate training or supervision; or (4) the existence of a custom or tolerance of, or

acquiescence in, federal rights violations.  *Burgess*, 735 F.3d at 478.

The Complaint brings claims that fall into the first (existence of an official illegal policy)

and third (policy of inadequate training or supervision) of these categories.  More specifically,

Warren brings claims that (1) Metro had an illegal official policy governing the use of force that

governed the actions that resulted in his injuries, and (2) failed to train its officers to avoid the

unconstitutional use of excessive force against him.

*Monell* permits municipal liability arising from the application or implementation of

unconstitutional municipal policies.  *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1116 (6th Cir.

1994) (citing *Monell*, 436 U.S. at 690).  Municipal liability may be imposed for a policy that may

or may not be reduced to writing. *Id.* at 1116 n.1. Liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. *Id.* at 1118 (citing *Pembaur*, 475 U.S. at 480); *see also Burgess*, 735 F.3d at 479.

The inadequacy of police training can also serve as a basis for Section 1983 liability, where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *Slusher*, 540 F.3d at 457. A plaintiff can establish deliberate indifference where a violation of his rights is a highly predictable, or plainly obvious, consequence of a municipality's failure to train. *Gregory v. City of Louisville*, 444 F.3d 725, 752–53 (6th Cir. 2006). To plead deliberate indifference, the plaintiff may allege prior instances of unconstitutional conduct demonstrating that the governmental entity has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury. *Slusher*, 540 F.3d at 457; *Gregory*, 444 F.3d at 752–53. In the alternative, where the constitutional violation is not alleged to be part of a pattern of past misconduct, a plaintiff may plead that a supervisory official or municipality has essentially completely failed to train the police force or trained it so that it is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result. *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982); (citing *Leite v. City of Providence*, 463 F.Supp. 585, 590-91 (D.R.I. 1978)).

Warren alleges in the Complaint that a Metro Lieutenant filed a report stating: (1) "the amount of force used does appear to be *inappropriate*" and (2) "the [use of force] *complies* with DCSO policies; however the inmate should have been placed in cuffs when he started treating [sic] staff." (Docket No. 1 at ¶ 26) (emphasis added). Warren further alleges that, five days later,

9

that same Lieutenant again concluded that the use of force was "*within* policy." (Docket No. 1 at ¶ 28) (emphasis added). Warren also alleges that the a Director of Security disagreed with this conclusion and stated that the use of force did *not* appear to be in compliance with DCSO policy or procedure. (*Id*. at ¶ 29) (emphasis added). In other words, the Complaint contains allegations that (1) a Metro Lieutenant twice stated that the use of force on Warren was inappropriate but complied with Metro policies; (2) the Lieutenant also stated that the officers did not act properly in failing to handcuff Warren; (3) a Metro Director of Security stated that the same use of force on Warren did not comply with policy or procedure.

The Court finds that, at this early stage of the litigation, Warren's allegations are sufficient to state both excessive force and failure to train claims against Metro. As to the excessive force claim, Warren specifically alleges that a Metro official stated as a matter of fact that the use of force that caused serious injuries to Warren "complies with [Metro] policies." This is sufficient to allow discovery to proceed as to whether Metro had an illegal official policy (written or unwritten) in place that governed the use of force on pretrial detainees during the booking process, whether that policy was followed by the Individual Defendants, and whether that policy resulted in the violation of Warren's constitutional rights via the use of excessive force. As to the failure to train claim, the court finds that, similarly, the alleged conflicting statements of the Lieutenant (that the use of force complied with Metro policy) and the Director of Security (that the use of force did not comply with Metro policy) raises above the speculative level the claim that there has been a failure to adequately train officers, such that deliberate indifference to the constitutional rights of pretrial detainees during the booking process may have been the result. In short, Warren has alleged directly conflicting interpretations of Metro policy

concerning the use of force. It is plausible that the direct result of this confusion could be (1) deliberate indifference to Warren's rights or (2) reckless or grossly negligent training such that misconduct was substantially likely to result. Warren is entitled to discovery on these questions.

The court is not persuaded by Metro's arguments to the contrary. At the motion to dismiss stage, the court must determine only whether Warren is entitled to offer evidence to support his claims, not whether he can ultimately prove the facts he alleges. Warren must merely plead factual content that allows the court to draw the reasonable inference that Metro is liable for the misconduct alleged. The court recognizes that the Sixth Circuit has noted that prevailing on a failure to train claim usually requires a showing of prior instances of unconstitutional conduct demonstrating that a municipality had ignored a history of abuse and was clearly on notice that the training in a particular area was deficient and likely to cause injury. *See Burgess*, 735 F.3d at 478-79 (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). It is also true, as Metro notes, that courts within the Sixth Circuit have, in light of *Iqbal*, viewed with disfavor complaints that have employed mere boilerplate language asserting a generalized "failure to train." *See, e.g., Minick v. Metro. Gov't of Nashville*, No. 3:12-CV-0524, 2014 WL 3817116, at *2 (M.D. Tenn. Aug. 4, 2014); *Okolo*, 892 F.Supp.2d at 944; *Johnson v. Metro. Gov't of Nashville*, No. 3:10-0589, 2010 WL 3619790, at *3 (M.D. Tenn. Sept. 13, 2010); *Arnold v. Metro. Gov't of Nashville*, No. 3:09-CV-0163, 2009 WL 2430822, at *5 (M.D. Tenn. Aug. 6, 2009).

However, Metro's analogy of these cases to the instant case – *i.e.*, Metro's claim that here, there is "no well-pleaded factual support" – is unpersuasive. Warren has not, as Metro asserts, "stopped short of including any facts related to a municipal custom or policy" of

11

permitting excessive force against pretrial detainees. Metro Br. at 9-10. As discussed, and in contradistinction to the scenarios in a number of cases cited by Metro, Warren has included several facts that directly implicate questions of the constitutionality of Metro's policy and training regarding the use of force (and, potentially, restraints) on pretrial detainees during the booking process at the CJC. *Compare with Minick*, 2014 WL 3817116 at *2 (finding complaint contained no allegations concerning how use of force in question related to municipal policies); *Okolo*, 892 F.Supp.2d at 944 (finding plaintiff alleged no facts to support deliberate indifference claim and that the complaint undermined any failure to train claim by alleging the municipality actually ordered a new training for officers); *Johnson*, 2010 WL 3619790 at *3 (finding complaint had no factual underpinning and failed to discuss any Metro policy in general); *Arnold*, 2009 WL 2430822, at *5 (dismissing failure to train claims because a one-time violation of the Metro Code did not alone give rise to a plausible inference of animus or ill-will without supporting allegations regarding policy that were absent from the complaint). In sum, Warren's allegations of conflicting official statements regarding whether the use of force against him complied with Metro policy moves the Complaint over the line from possibility to facial plausibility regarding claims as to whether Metro may have been employing an illegal policy or may have been training its officers in a manner that resulted in a violation of Warren's rights. Accordingly, the motion to dismiss will be denied as to Warren's Section 1983 claims against Metro.

### C. TGTLA Claim

The Tennessee Governmental Tort Liability Act ("TGTLA") codifies Tennessee's common law rules concerning sovereign immunity and states exceptions to the general grant of

12

immunity from suit. *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001). Under the statute, the default rule is that, except as otherwise stated within the TGTLA, "[a]ll governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29–20–201(a). The TGTLA contains specific provisions that waive sovereign immunity for identified types of claims, including (1) certain claims stemming from the negligent operation of motor vehicles by government employees acting within the scope of their employment (§ 202), (2) injuries caused by defective, unsafe, or dangerous conditions on highways streets, and sidewalks (§ 203), (3) injuries caused by certain "dangerous structures" under specified circumstances (§ 204), and (4) certain injuries stemming from the "negligent acts or omissions" of public employees acting within the scope of their employment (§ 205). Only the last of these limited waivers of sovereign immunity applies here.

In relevant part, § 205 states as follows:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of employment, except if the injury arises out of . . . (2) False imprisonment pursuant to mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights.

*Id.* § 29–20–205(2). Stated differently, a governmental entity is liable for the negligent acts of its employees (but not their intentional acts), unless the alleged injury proximately caused by the government employee "arise[s] out of ... civil rights." *Id.*

Courts agree that the "civil rights" exception preserves the state's immunity against

claims arising under the United States Constitution and Section 1983. *See Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2011). Thus, a negligence claim falls within this exception where the same circumstances give rise to both the negligence and civil rights claims. In other words, the TGTLA "preserves immunity for suits claiming negligent injuries arising from civil rights violations." *Id.* For example, in *Johnson*, the Sixth Circuit held that a widow could not add a state law negligence claim to Section 1983 suit alleging Fourth Amendment violations by police officers, because the negligence claim arose out of the same circumstances giving rise to her Section 1983 civil rights claim. *See id.* While the Sixth Circuit has observed that a case involving allegations that a municipality engaged in independent negligent acts in hiring, supervising, or disciplining an officer may involve "other circumstances . . . that are temporally and factually distinct," *see Partee v. City of Memphis, Tenn.*, 449 F. App'x 444, 449 (6th Cir. 2011), most courts have concluded that, where a case fundamentally sounds in a violation of an individual's federal civil rights (such as an excessive force claim), then claims against the government employer for negligent hiring, retention, or supervision fall within the "civil rights" exception to the waiver of sovereign immunity. In other words, courts applying the TGTLA have generally found that the government is immune from negligent hiring, supervision, and retention claims, where the underlying incident giving rise to the lawsuit fundamentally involves civil rights violations. Furthermore, courts have found that a plaintiff cannot avoid the TGTLA's immunity restrictions simply by "couching some of [his] civil rights claims against the [c]ounty in the guise of negligence," particularly where the "underlying acts which [the plaintiff] alleges to be negligent are by their very nature the type of conduct one usually associates with intentional torts [ ]." *Campbell v. Anderson Cnty.*, 695 F.Supp.2d 764, 778 (E.D. Tenn. 2010); *see also, e.g.,*

14

*Okolo*, 892 F.Supp.2d at 947 (concluding that the plaintiff's state law negligence claims arose out of the same circumstances as his Fourth and Fourteenth Amendment Section 1983 civil rights claims and thus were barred by the TGTLA's retention of municipal immunity for injuries arising from civil rights); *Noyes v. City of Memphis*, 2012 WL 3060100, at *3 (W.D. Tenn. July 25, 2012); *Targonski v. City of Oak Ridge*, 2012 WL 2930813, at *11 (E.D. Tenn. July 18, 2012); *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 852-53 (E.D. Tenn. Aug. 10, 2011) (finding negligence claim was based on underlying civil rights excessive force claim and was therefore barred by the TGTLA)*; Hale v. Randolph*, No. 1:02-CV-334, 2004 WL 1854179, *14-17 (E.D. Tenn. Jan. 30, 2004) (holding municipality immune from claims of negligence *per se* that arose out of, and flowed from, tortious acts of false arrest and excessive force).

In this case, all wrongful acts are alleged to have been committed in the context of the use of excessive force against Warren. Accordingly, this case is controlled by the result in *Johnson*. Warren's TGTLA claim against Metro arises out of the same allegedly tortious circumstances giving rise to his Section 1983 claims under the Fourteenth Amendment. Therefore, it is barred by the TGTLA's retention of municipal immunity for injuries arising from civil rights.[4] Accordingly, Warren's TGTLA claim against Metro will be dismissed.

## II.  <u>Defendants Lloyd and Hayes</u>

---

[4] Metro is immune from Warren's negligence claim under the TGTLA, but the Individual Defendants are not. *See* Tenn. Code Ann. § 29-20-310 ("No claim may be brought against an employee . . . for damages for which the immunity of the governmental entity is removed by this chapter . . . "); *Spears v. Cooper*, 1:07-CV-58, 2009 WL 838179 (E.D.Tenn. Mar. 30, 2009), *rev'd in part sub nom. Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009); *Stone v. City of Grand Junction, Tenn.*, 765 F.Supp.2d 1060, 1078-79 (W.D. Tenn. 2011) (where the municipality's immunity from state tort claim is not removed by the TGTLA, police officer is proper party defendant); *see also Okolo*, 892 F.Supp.2d at 947-48.

### A.     Official Capacity Claims

Although Warren purports to sue Lloyd and Hayes in their personal and "official"
capacities, as employees of Metro, they have no official capacity in which they can be sued.  *See*
*Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that an official capacity suit is, in all
respects other than a name, to be treated as a suit against the entity).  Accordingly, the official
capacity claims against Lloyd and Hayes will be dismissed.[5]

### B.     Conspiracy Claims

"A civil conspiracy under [Section] 1983 is 'an agreement between two or more persons
to injure another by unlawful action.'"  *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir.
2011) (quoting *Revis v. Meldrum*, 489 F.2d 273, 290 (6th Cir. 2007)).  To advance a civil
conspiracy claim under Section 1983, Warren must plead that (1) a single plan existed, (2) each
defendant shared in the general conspiratorial objective to deprive Warren of his constitutional
rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to
Warren.  *See Bazzi*, 658 F.3d at 602.  "Express agreement among all the conspirators is not
necessary to find the existence of a civil conspiracy and each conspirator need not have known of
the details of the illegal plan or all of the participants involved."  *Id.* (internal brackets omitted);
*see also Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011).  "It is
well-settled that conspiracy claims must be pled with some degree of specificity and that vague
and conclusory allegations unsupported by material facts will not be sufficient to state such a

---

[5] The court will also dismiss the official capacity claims against defendants Snipes and
Williams.  While they did not file a motion requesting this action, it is the (sole) subject of
Metro's Second Motion to Dismiss, to which there has been no response from Warren.  (Docket
No. 41.)

claim under Section 1983." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)); *accord Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir. 2004). This is a "relatively strict" pleading standard. *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008).

The Complaint does not contain a separate claim that sets forth factual allegations concerning the elements of a conspiracy to violate Warren's constitutional rights. The only paragraph in which Warren overtly discusses a "conspiracy" contains a vague legal conclusion: "Each Defendant, individually and in conspiracy with one another, were acting within the scope of their employment, and under color of state law at all times material to the allegation [sic] contained in this Complaint." (Docket No. 1 at ¶ 11.) The court need not accept this legal conclusion as true, and it declines to do so. *See Heyne*, 655 F.3d at 563-64 (reaching same result); *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (reaching same result). Legal conclusions that are "masquerading as factual allegations" will not suffice. *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010) (quoting *Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 903 (6th Cir. 2009)).

The closest the Complaint comes to alleging coordinated activity against the plaintiff is claiming that all four of the Individual Defendants subjected Warren to force and restraint at the same time. (Docket No. 1 at ¶ 16.) The court need not opine on whether this might be sufficient to plead an overt act, because the Complaint does not contain any specific allegations of the other elements of a conspiracy – *i.e.*, either (1) a common plan or (2) an agreement between Lloyd, Hayes, and/or any other Individual Defendant to violate Warren's constitutional rights. Indeed, Warren's factual allegations of a conspiracy are no more specific than other allegations the Sixth

Circuit has deemed insufficient. *See Moldowan v. City of Warren*, 578 F.3d 351, 394–95 (6th Cir. 2009); *Gutierrez*, 826 F.2d at 1538–39; *Heyne*, 655 F.3d at 564 (citing *Spadafore*, 330 F.3d at 854). Merely alleging that all of the Individual Defendants simultaneously attacked Warren is insufficient to plead a conspiracy. Warren's failure to plead a plan or agreement to violate his constitutional rights is fatal to his conspiracy claim.[6] *See Mettetal v. Vanderbilt Univ., Legal Dep't*, 147 F. App'x 577, 585 (6th Cir. 2005) (concluding that a district court correctly dismissed certain conspiracy claims for failure to allege that the parties had entered into an agreement or formed a single plan). Because Warren has not plausibly stated a conspiracy claim against Lloyd or Hayes, the court will dismiss those claims.[7]

### C.  Section 1983 Claims

Typically, the Fourteenth Amendment's Due Process Clause protects pretrial detainees

---

[6] In the Response, Warren, citing to the Sixth Circuit decision in *Bazzi*, asserts that the conspiracy claims against Lloyd and Hayes should not be dismissed because "a tacit or mutual understanding between the parties is enough to prove a conspiratorial agreement. . . . A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *See* Response at 11 (citing *Bazzi*, 658 F.3d at 602). *Bazzi* is an appeal of a summary judgment decision in which the court examined the extent to which a fact finder can rely on inferences as opposed to material facts in finding the existence of a civil conspiracy under Section 1983. *See Bazzi*, 658 F.3d at 600-03. It is not of assistance regarding the elements of a Section 1983 conspiracy that Warren must plead to survive a motion to dismiss.

[7] Warren notes that the other Individual Defendants, Snipes and Williams, have not moved to dismiss his conspiracy (or any) claim against them. Accordingly, the result of the court's decision will be that the conspiracy claim will be dismissed as to two of the Individual Defendants and will remain as to the other two Individual Defendants. Warren suggests that this result is to be avoided and that "no judicial or litigant resources would be wasted" by simply allowing the claims against Lloyd and Hayes to proceed. Response at 11. However, the fact that two defendants failed to move to dismiss is not a valid reason to deny other meritorious motions or to allow infirm claims to proceed. Regardless, the court finds it appropriate to dismiss the conspiracy claims against Lloyd and Hayes without prejudice, especially given the video evidence of the event in question. Plaintiff may seek leave of court to file an amended complaint to re-assert conspiracy claims against Lloyd and Hayes if the circumstances so warrant.

from excessive force that amounts to punishment, *Leary v. Livingston Cnty.*, 528 F.3d 438, 443 (6th Cir. 2008), and the Eighth Amendment protects convicted prisoners from "unnecessary and wanton infliction of pain," *Graham v. Connor*, 490 U.S. 386, 398 n.11 (1989) (internal quotation marks omitted).  The difference is this: an excessive force claim under the Eighth Amendment requires that the plaintiff show that force was not "applied in a good-faith effort to maintain or restore discipline," but instead applied "maliciously and sadistically to cause harm." *See Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995).  But an excessive force claim under the Fourteenth Amendment operates on a sliding scale.  *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 134 (6th Cir. 2014).  Generally, to constitute a Fourteenth Amendment violation, an official's conduct must "shock [ ] the conscience."  *Burgess*, 735 F.3d at 473.

When officials respond to "a rapidly evolving, fluid, and dangerous predicament," *id.* (internal quotation marks omitted), the Fourteenth Amendment's excessive force standard is the same as the Eighth Amendment's: "the plaintiff must show that the defendant acted maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline." *Id.* (internal quotation marks omitted).  However, "[w]here defendants are afforded a reasonable opportunity to deliberate . . . [,] their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiff's federally protected rights."  *Id.* (alteration in original) (internal quotation marks omitted). See *Shreve*, 743 F.3d at 134; *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001); *Burgess*, 735 F.3d at 473.

Lloyd and Hayes contend, without any support, that the situation described in the Complaint was "rapidly evolving, fluid, and dangerous."  However, the Complaint alleges the

opposite – that the attack occurred, unprovoked, during the normal "booking . . . process." (Docket No. 1 at ¶ 14.)  This is not a rapidly-evolving, fluid or dangerous event.  Accordingly, to determine whether Warren has sufficiently pleaded conscience-shocking conduct, the court looks only to whether Warren has alleged conduct that, taken as true, demonstrates "deliberate indifference" toward Warren's federally's protected rights.  Warren has alleged that the Individual Defendants attacked him and caused him severe injury.  More specifically, Warren has alleged that (1) Lloyd pushed down on the legs of Warren, and applied restraints thereto, in a manner that resulted in a broken fibula and fractured ankle that required surgery, and (2) while Lloyd did so, Hayes applied force and restraint to Warren's upper body and prevented him from getting up.  The Complaint also generally alleges that all of the Individual Defendants subjected Warren to further force and restraint, including abandoning him while badly injured in a seclusion cell for over an hour.

The court finds that, at this stage, Warren has sufficiently pleaded excessive force claims against Lloyd and Hayes.  Warren's allegations are neither conclusory nor factually bereft, as Lloyd and Hayes contend.  To the contrary, Warren has plausibly stated claims that may entitle him to relief.  Accordingly, Warren's excessive force claims against Lloyd and Hayes, in their individual capacities, will proceed.

Lloyd has raised the potential defense of qualified immunity.  In civil suits for money damages, government officials are entitled to qualified immunity for discretionary acts that do "not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987).  Qualified immunity is rooted in the premise that government officials should be free from the costs,

burdens, and distractions of litigation, and that they are thus entitled to dismissal from suit early in the litigation process where the claims against them are unsustainable. *See Crawford-El v. Britton*, 523 U.S. 574597-98 (1998). However, courts must also guard against making a qualified immunity determination too "hastily"; that is, dismissing a viable claim before discovery can provide support to the necessarily generalized complaint allegations. *Vaughn v. United States*, 65 F.3d 1322, 1326 (6th Cir. 1995); *Grose v. Caruso*, 284 F. App'x 279, 283 (6th Cir. 2008). The Supreme Court has given guidance as to how trial courts should approach the timing of a qualified immunity determination. Specifically, the Court has stated that, if a defendant offers an immunity defense before discovery, the trial court should examine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law.[8] *Crawford-El*, 523 U.S. at 598 (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). If a plaintiff's action fails this test, the official is entitled to an early application of the qualified immunity doctrine. However, if the plaintiff's action survives this test and is otherwise viable, the plaintiff ordinarily will be entitled to discovery, and the qualified immunity defense will be re-asserted and resolved at a later stage.[9] *Id; see also Goad v. Mitchell*, 297 F.3d 497, 504-05

---

[8] The court may also order a reply to an answer under Rule 7(a) or grant a defendant's motion for a more definite statement under Rule 12(e) – neither of which option is relevant here. *See Crawford-El* at 598.

[9] It is not uncommon for defendants to request, and for judges to prioritize, discovery that relates to qualified immunity. District judges are vested with extensive discretion concerning the conduct of discovery and can structure it so that, as the evidence is gathered, defendant officials may move for partial summary judgment on issues that are potentially dispositive. The Supreme Court has noted that courts and the parties "should give priority to discovery concerning issues that bear upon the qualified immunity defense, such as the actions that the official actually took, since that defense should be resolved as early as possible." *Crawford-El*, 523 U.S. at 600. Judges do also, of course, have the discretion to postpone ruling on a defendant's summary judgment motion if the plaintiff needs additional time to explore facts essential to the party's

(6th Cir. 2002) (adopting *Crawford-El* and finding that it overruled a heightened Sixth Circuit pleading requirement on civil rights plaintiffs in cases in which the defendant raised the defense of qualified immunity). In this latter type of case, the Supreme Court reminds us that "summary judgment [still] serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Id.* at 600; *see also Grose*, 284 F. App'x at 283 (noting that it is not uncommon to decide qualified immunity at summary judgment).

As discussed above, the court has considered the allegations of the Complaint and found that, taken as true only for purposes of the motion to dismiss, Lloyd's actions constitute excessive force that violates clearly established law under the Fourteenth Amendment. The court finds, therefore, that a grant of qualified immunity to Lloyd at this stage of the case would be premature and that Warren is entitled to proceed with discovery. The court notes that Warren has alleged that there is a video recording of the alleged attack that has yet to be disclosed; the contents of this video may certainly play a role in any subsequent qualified immunity analysis. This disclosure of the video and other evidence relevant to qualified immunity (*e.g.*, the actions actually taken by the officers) should be prioritized in discovery. Lloyd (and any other Individual Defendant) is free to raise qualified immunity at a later stage of this case.

### D. TGTLA Claim Against Hayes

Hayes argues that Warren's state law claim under the TGTLA against him should be dismissed because the Tennessee courts have expressed an express preference that TGTLA claims be handled by state courts. *See Arbuckle v. City of Chattanooga*, 696 F. Supp. 2d 907, 928 (E.D. Tenn. 2010) (citing Tenn. Code Ann. § 29-30-307 ("The circuit state courts shall have

opposition. *Id.*

exclusive original jurisdiction over any action brought under this chapter . . . .")).  Hayes

identifies a split of decisions in this circuit and highlights certain cases in which supplemental

TGTLA claims have been dismissed based on the rationale that the Tennessee exclusivity

provision is an "exceptional circumstance" for declining jurisdiction under 28 U.S.C. § 1367(c).[10]

Most of these cases rely upon *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 446 (6th Cir. 2000),

*abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health &*

*Human Res.*, 532 U.S. 598 (2001), which concluded that the exclusive jurisdiction provision of

the TGTLA demonstrates the legislature's "unequivocal preference" for TGTLA claims to be

handled by state courts and is an exceptional circumstance that may be used to decline

supplemental jurisdiction.

However, neither *Gregory* nor the Tennessee legislature's preference that TGTLA claims

be handled in state courts *requires* dismissal of supplemental TGTLA claims.  *Id.* at 446.  To the

contrary, the grant of original jurisdiction over TGTLA claims to state circuit courts does not

defeat federal jurisdiction.  *Dillingham v. Millsaps*, 809 F.Supp.2d 820, 850-51 (E.D. Tenn.

2011).  Indeed:

_____

[10] Under 28 U.S.C. § 1367(c), "[t]he district courts may decline to exercise supplemental
jurisdiction over a claim . . . if -- (4) in exceptional circumstances, there are other compelling
reasons for declining jurisdiction.  28 U.S.C. § 1367(c)(4).

> State legislatures are powerless to impose jurisdictional constraints
> upon the federal judiciary. Whatever the intent of the Tennessee
> legislature may have been in enacting the Governmental Tort
> Liability Act, the authority of the federal courts to appropriately
> exercise jurisdiction over supplemental state law matters remains
> undiminished. To rule otherwise would be to imply that a state
> could nullify two centuries of case law and an entire federal statute
> on the subject of supplemental jurisdiction by merely expressing a
> preference that all state law controversies be kept "in-house."

*Brown v. City of Memphis*, 440 F.SUpp.2d, 868, 878 (W.D. Tenn. 2006). Sister courts choosing to retain jurisdiction have also noted the *Brown* court's additional rationale that dismissal of TGTLA claims can "necessitate duplicative litigation which would be wasteful of judicial and litigant resources." *Dillingham*, 809 F.Supp.2d at 851 (quoting *Brown*, 440 F.Supp.2d at 878); *see also Birgs v. City of Memphis*, 686 F.Supp.2d 776, 778-79 (W.D. Tenn. 2010) (finding that separate state and federal proceedings would "waste the resources of the state and federal courts"); *Harris v. McCormack*, No. 3:08-cv-00699, 2011 WL 253163, at *4 (M.D. Tenn. Jan. 26, 2011) (concluding that judicial economy, convenience, and fairness counseled against declining jurisdiction over TGTLA claims).

Here, as discussed *supra*, Warren's federal and TGTLA claims arise from the same incident and involve (to this point) the same issues. In light of the above cited considerations, the court finds the more compelling rationale dictates retaining jurisdiction at this time over the TGTLA claim against Hayes (and the other Individual Defendants). This is particularly so, given the early stage of this case and the fact that the federal and state claims so closely arise from the same events and will likely have such overlapping discovery. *See, e.g., White v. Washington Cnty., Tenn.*, No. 2:14-CV-172, 2015 WL 140518, at *3-4 (E.D. Tenn. Jan. 12, 2015) (deciding to retain jurisdiction over TGTLA claim against individual officer, "particularly given the early

stage of the case"); *Okolo*, 892 F.Supp.2d at 948 (finding "no compelling reason" to give up jurisdiction over TGTLA claim against individual Metro officer where state claim and federal civil rights claim arose from same alleged unlawful seizure).[11]

## SUMMARY

In summary, the court's Order will have the following effect:

(1)     The conspiracy claim against Metro will be dismissed with prejudice;

(2)     The TGTLA claim against Metro will be dismissed with prejudice;

(3)     All claims against all Individual Defendants in their "official capacities" will be dismissed with prejudice;

(4)     The conspiracy claims against Lloyd and Hayes will be dismissed without prejudice;

(5)     The Section 1983 claims against Metro will proceed;

(6)     The Section 1983 claims against Lloyd and Hayes in their personal capacities will proceed;

(6)     The TGTLA claim against Hayes will proceed; and

(7)     All other remaining claims in the Complaint (*i.e.*, not subject to the pending motions) will proceed.

## CONCLUSION

Metro's First Motion to Dismiss (Docket No. 20) will be granted in part and denied in part.  Lloyd's partial Motion to Dismiss (Docket No. 24) will be granted in part and denied in

---

[11] The court retains the right, of course, to decline supplemental jurisdiction at any subsequent stage of the case.

part.  Hayes's Motion to Dismiss (Docket No. 35) will be granted in part and denied in part. Metro's Second Motion to Dismiss (Docket No. 41) will be granted.

Metro, Lloyd and Hayes shall answer the Complaint within twenty days of the entry of this order.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge